BURGER KING CORPORATION,
Plaintiff,

v.

ASHLAND EQUITIES, INC., Reinold
T. Belle, and Robert E. Clarke,
Defendants.

No. 00–1804–CIV GOLD.

United States District Court,
S.D. Florida.

Jan. 8, 2002.

Michael Joblove, Jonathan E. Perlman, Nina Greene Kersh, Jessica Serell Erenbaum, Dennis Deam Leone, Genovese Lichtman Joblove & Battista, Miami, FL, for plaintiff.

Robert Zarco, Robert M. Einhorn, Jude Christopher Cooper, Zarco & Pardo, P.A., Miami, FL, for defendants.

## ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION OF COURT ORDER DENYING PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM

GOLD, District Judge.

**THIS CAUSE** is before the Court upon Plaintiff's (Burger King Corporation ("BKC")) Motion for Reconsideration of this Court's August 17, 2001 Order on Plaintiff's Motion to Dismiss Defendants' Counterclaim [D.E. 44], filed on August 21, 2001. Defendants (Reinold T. Belle ("Belle"), Robert E. Clark ("Clark"), and Ashland Equities, Inc. ("Ashland")) filed a Response [D.E. 56] on November 6, 2001 and Plaintiff BKC replied [D.E. 73] on December 17, 2001. Oral argument on Plaintiff's Motion for Reconsideration was held on Friday, January 4, 2002. This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. Upon consideration of the pleadings, the arguments of counsel, and all relevant case law, the Court concludes that Plaintiff's Motion for Reconsideration should be denied.

## I. BACKGROUND

### A. *Nature of Case*

On May 24, 2000, Plaintiff BKC filed suit against Defendants Belle, Clarke, and Ashland, seeking the recovery of royalties, rent and other fees allegedly owed to Plaintiff under various franchise and guaranty agreements. Defendants filed their Answer and Affirmative Defenses to the complaint on February 12, 2001 [D.E. 21], in which they denied all liability under Plaintiff's allegation. On that date, Defendants also collectively submitted a Counterclaim [D.E. 21] alleging, in general, that the Plaintiff wrongfully rejected Defendants' request to assign their interest under five (5) franchise agreements. Defendants specifically alleged the following: (1) breach of contract, (2) breach of implied covenants of good faith and fair dealing, (3) tortious interference with contractual relations, and (4) violations of the Florida Deceptive Trade Practices Act.

In response to the Defendants' allegations, Plaintiff BKC filed a Motion to Dismiss the Defendants' Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) [D.E. 22] on March 2, 2001. Defendants filed a Response [D.E. 24] to Plaintiff's Motion and the Plaintiff replied [D.E. 25]. On August 17, 2001, upon full consideration of the parties' arguments, the Counterclaim, and the relevant case law, this Court granted Plaintiff's motion to dismiss in part and denied the motion in part. Specifically, the Court found that the Defendants adequately stated a claim for tortious interference with contractual relations (count III) in their Counterclaim. However, Defendants' claim alleging that the Plaintiff violated the Florida Unfair and Deceptive Trade Practices Act (count IV) was dismissed with prejudice as the Defendants lacked standing to sue under the statute. August 17, 2001 Order [D.E. 41], p. 12.

In the present matter, the Plaintiff requests the Court to reconsider its decision denying the motion to dismiss in regard to Defendants' state claim for tortious interference with contractual relations against the Plaintiff. The parties' argument and the relevant case law are discussed in detail below.

**1368**

### B. *Factual Allegations*

The Burger King Corporation is a Florida corporation with its principal offices located in Miami, Florida. Pl.'s Compl. at ¶ 2. Its business operations include, among other things, both the management and franchising of Burger King fast food restaurants throughout the country. Pl's Compl. at ¶ 6. Franchisees of Burger King restaurants are authorized to use the Burger King names and systems, including service marks and trademarks. Pl.'s Compl. at ¶ 16. Under the terms of the typical Burger King Franchise Agreement, including the ones at issue, franchisees are obligated to make monthly payments to the Burger King Corporation for satisfaction of royalties, advertising expense, and other fees. Pl.'s Compl. at ¶ 20.

On or about January 28, 1980, Defendants Belle and Clarke jointly negotiated for and entered into a long-term franchise agreement with Plaintiff for the authorization to operate a Burger King restaurant in the state of Kentucky. Pl.'s Compl. at ¶¶ 8, 16. Thereafter, Belle and Clark continued negotiations with Plaintiff for the franchising rights to open more restaurants. Pl's Compl. at ¶ 16. Up to the time at which this dispute arose, Belle and Clarke jointly owned and operated four (4) Burger King restaurants pursuant to four (4) separate Burger King Franchise Agreements. Pl.'s Compl. at ¶ 16. Defendant Ashland, in turn, owned and operated one (1) Burger King restaurant located in Kentucky. Pl.'s Compl. at ¶ 18.

In or around August of 1999, Defendants entered into a Purchase Agreement with Regional Investments, Inc. ("RII") for the sale of all five of the Burger King restaurants described above. Def.'s Countercl. at ¶ 4.[1] Pursuant to the sales agreement, RII was to receive, among other things, all the rights and interests Defendants held under each of the five separate franchise agreements governing the operation of these restaurants. Def.'s Countercl at ¶¶ 4, 5. Sections 14 and 15 of the franchise agreements provide, however, that any attempts to sell, assign, or transfer the rights or interests granted under agreements are subject to plaintiff's written consent. Def.'s Exh. A. at §§ 14, 15.[2] The manner by which franchisees are to proceed in requesting Plaintiff's approval is laid out in Section 15(D) of the franchise agreements. Def.'s Exh. A at § 15. Specifically, Section 15(D) reads: "Prospective purchaser must complete and be approved through [Plaintiff's] standard franchisee selection process including satisfactorily demonstrating to [Plaintiff] that he meets the financial, character, managerial, equity ownership and such other criteria and conditions as [Plaintiff] shall then be applying in consideration applications for new licenses." Def.'s Exh. A at § 15D(2). In turn, Section 15(D) provides that if these standards are met Plaintiff's consent will not be unreasonably withheld. Def.'s Exh. A at § 15. According to Defendants, both they and RII attempted to comply with the terms of section 15. Def.'s Countercl. at ¶ 5. Over a period of eight (8) months, Defendants and RII repeatedly attempted

---

1. Defendants' Counterclaim mistakenly labeled "Ashland Investments, Inc." as the purchaser to the sales agreement at issue in its initial Counterclaim. The Court, however, granted Defendants' leave to amend the Counterclaim in order to substitute "Ashland Investments, Inc." with "Regional Investments, Inc." *See* Defendants' First Amended Counterclaim [D.E. 23].

2. Section 14A states that the franchise agreements "are personal to FRANCHISEE, and FRANCHISEE shall not sell, assign, or transfer this Agreement or any right or interest in the license granted, nor permit any such assignment or operations of law without prior written consent of BKC."

to demonstrate the qualification and expertise possessed by RII's members. Def.'s Countercl. at ¶ 5. However, on May 2, 2000, Plaintiff issued a letter announcing that RII failed to satisfy the standards for franchise approval and denied RII's application. Def.'s Countercl. at ¶ 7.[3]

Soon thereafter, on May 24, 2000, Plaintiff filed the instant complaint against Defendants seeking the recovery of royalties, rents and other fees allegedly unpaid by Defendants. Pl.'s Compl. at ¶¶ 1,27,29.33. On February 12, 2001, Defendants initiated a Counterclaim alleging that Plaintiff unreasonably withheld its consent for the sale of the franchised restaurants at issue. Def.'s Countercl. at ¶ 1. More specifically, Defendants allege that Plaintiff was aware of RII's qualifications, including the fact that the proposed managing directors of RII each had eleven (11) years of experience in the franchise business and possessed sufficient business education as well as the financial resources to satisfy all the conditions of consent imposed by Plaintiff. Def.'s Countercl. at ¶ 9. As a result of Plaintiff's alleged unreasonable refusal to grant RII's request, Defendants assert that they have incurred substantial damages. Def.'s Countercl. at ¶¶ 20,27, 33, 49. On October 13, 2000, Plaintiff terminated each of the franchise agreements at issue. Def.'s Countercl. at ¶ 12. Subsequently, Defendants closed all five (5) restaurants. Def.'s Countercl. at ¶ 12.

## II. LEGAL STANDARD

The "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Z.K. Marine Inc. v. M/V*

*Archigetis,* 808 F.Supp. 1561, 1563 (S.D.Fla.1992). In particular, there are three major grounds which justify reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *See Offices Togolais Des Phosphates v. Mulberry Phosphates, Inc.,* 62 F.Supp.2d 1316, 1331 (M.D.Fla.1999); *See also Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 694 (M.D.Fla.1994). In order to reconsider a judgment there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. *Sussman,* 153 F.R.D. at 694. A "motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made." *Z.K. Marine Inc.,* 808 F.Supp. at 1563. Instead, a motion for reconsideration is appropriate where the "Court has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the Court by the parties, or has made an error not of reasoning, but of apprehension . . . . Such problems rarely arise and the motion to reconsider should be equally rare." *Z.K. Marine Inc.,* 808 F.Supp. at 1563 (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va. 1983); *Moog, Inc. v. United States,* No. 90–215E, 1991 WL 255371, at *1, 1991 U.S. Dist. Lexis 17348, at *2 (W.D.N.Y. Nov.21, 1991)).

District court decisions on motions for reconsideration are reviewed for abuse

---

**3.** Additionally, on May 12, 2000, Gregg Hicks, BKC's Director of Franchise Operations of the Southeast Region, informed the Defendants that "the primary reasons for rejecting RII's application were lack of restaurant and operational experience and the fact that RII was going to finance one hundred (100%) of

the deal." Def.'s Countercl. at ¶ 8. BKC further stated that it "disapproved the sale because of RII's insufficient capital investment plan—in light of the fact that several of the units would have to be torn down and rebuild—and unrealistic sales projections." Def.'s Countercl. at ¶ 8.

of discretion, thus affording the courts with substantial discretion in their rulings. *See Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.,* 763 F.2d 1237, 1238–39 (11th Cir.1985); *See also Offices Togolais Des Phosphates,* 62 F.Supp.2d at 1331. A district court abuses its discretion when a relevant factor deserving a significant weight is overlooked, when an improper factor deserving of significant weight is overlooked, or when the court considers the appropriate mix of factors, but commits palpable error of judgment in calibrating the decisional scales. *See United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.).

■ Furthermore, reconsideration of a previous order is an extraordinary remedy to be employed sparingly. *See Mannings v. School Board of Hillsborough County,* 149 F.R.D. 235, 235 (M.D.Fla.1993). For reasons of policy, courts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation which are often laced with close questions. *Sussman,* 153 F.R.D. at 694. There is a badge of dependability necessary to advance the case to the next stage. *Kuenz v. Goodyear Tire & Rubber Company,* 617 F.Supp. 11, 14 (N.D.Ohio 1985).

## III. DISCUSSION

### A. *Court Order Denying Motion to Dismiss Count III (Tortious Interference with Contractual Relations)*

As previously noted, in light of the facts discussed above, this Court denied Plaintiff's Motion to Dismiss Count III [4] (Tortious Interference with Contractual Relations) of Defendants' Counterclaim. In its Motion to Dismiss Count III, Plaintiff asserted, in relevant part, that Defendants' claim for tortious interference should be dismissed because such a claim "cannot lie against one who is a party to the contract which is the subject of the alleged interference." August 17, 2001 Order [D.E. 41], p. 7. While this Court agreed with Plaintiff BKC that Florida law generally holds that a cause of action cannot exist against one who is a party to the contract, the Court found in favor of the Defendants because the Court similarly recognized that a party's "privilege to interfere" in a contract is "limited and does not afford an absolute bar to liability." August 17, 2001 Order [D.E. 41], p. 8. Indeed, the order recognized that, pursuant to several Florida state court cases, the privilege to interfere is a valid defense only where interference "was not done for some improper purpose." *Id.*

In support of the order denying Plaintiff's Motion to Dismiss Count III of the Counterclaim, this Court distinguished *Hall v. Burger King Corp.,* 912 F.Supp. 1509 (S.D.Fla.1995), and relied upon the unpublished Eleventh Circuit holding in *KMS Rest. Corp. v. Wendy's Int'l Inc.,* No. 98–5336 (11th Cir. Feb.2, 2000) [5] for its decision. Specifically, the Court held that *Hall* was distinguishable from the present case because there were no allegations of "improper purpose" against the interfering

---

4. Defendants' initial Counterclaim, upon which the Court's decision was rendered, states: "BKC arbitrarily, unilaterally, wrongfully, maliciously, and intentionally interfered with the contract between [Defendant] and [RII] by using pretextual and demonstrably false grounds to justify its refusal to consent to the sale of the Subject Restaurants." Countercl. at ¶ 31.

5. Pursuant to Rule 36–2 of the United States Court of Appeals for the Eleventh Circuit Rules, while unpublished opinions are not considered binding precedent, they may be cited as persuasive authority, provided that a copy of the unpublished opinion is attached.

party. August 17, 2001 Order [D.E. 41], p. 9. In the case at bar, however, the Defendants have alleged that Burger King acted in bad faith when it denied approval to sell the franchise restaurants at issue. *Id.* The Court accordingly discussed the Eleventh Circuit's decision in *KMS Rest. Corp. v. Wendy's Int'l Inc.* as it was on all fours with the present case.

In *KMS*, KMS filed suit against Wendy's alleging tortious interference with contractual relations claiming that Wendys interfered with the sale of the restaurants at issue and acted outside of the scope of its rights in the Contract. *KMS*, No. 98–5336 (11th Cir. Feb. 2, 2000) at 7. The Eleventh Circuit distinguished several Florida state cases relied upon by Wendy's and surveyed Florida law regarding tortious interference with contractual relations. Although Wendy's had the right to final franchise approval pursuant to a franchise agreement in *KMS*, upon review of various Florida state cases, the Eleventh Circuit concluded that the privilege to interfere was, indeed, limited and qualified. *Id.* at 11. The Court further held that "[w]hether the franchisor has gone beyond its limited and qualified privilege is generally a question for the trier of fact." *Id.* at 11–12. Accordingly, the Court reversed a prior grant of summary judgment in favor of the franchisor, Wendy's, as an issue of fact existed regarding improper purpose and whether Wendy's exceeded its privilege. *Id.* at 12. Consistent with the holding in *KMS*, this Court concluded that the Defendants in the present case sufficiently stated a claim for tortious interference where they alleged that BKC maliciously intefered with the contract between the Defendants and RIII by using pretextual and false grounds to withhold its consent.

Accordingly, Plaintiff's Motion to Dismiss was denied.

**B.  *Motion for Reconsideration***

In its Motion for Reconsideration, Plaintiff BKC requests this Court to reconsider its prior Order denying Plaintiff's Motion to Dismiss Count III (tortious interference with contractual relations) of Defendants' Counterclaim because BKC asserts this Court mistakenly relied upon *KMS Restaurant Corp. v. Wendy's Int'l Inc.*, No. 98–5336 (11th Cir. Feb.2, 2000), an unpublished decision from the Eleventh Circuit. Plaintiff BKC argues that the published Eleventh Circuit case, *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285 (11th Cir.2001) supercedes and abrogates the decision in *KMS* because it holds that a franchisee's tortious interference claim is "impermissible as a matter of law" where a franchise agreement expressly gives the franchisor the right to disapprove a transfer or other action and that a franchisor "consequently [is] not a third party to the transaction with which it allegedly interfered as required to state such a claim." Motion for Reconsideration, p. 4. Additionally, Plaintiff BKC forwards that the *Ford* decision also states an "entirely separate ground" for dismissal in a footnote—namely, that the franchisor at issue was "privileged to interfere." Motion for Reconsideration, p. 6–7. The Plaintiff notes that the Eleventh Circuit rejected the franchisee's argument that the "privilege to interfere" is qualified. Motion for Reconsideration, p. 6. Instead, the Eleventh Circuit held that the privilege only becomes qualified if the "sole basis for disapproving the transaction was malicious." Motion for Reconsideration, p. 6 (quoting *Ford*, 260 F.3d at 1294).[6] Accordingly, Plaintiff BKC

---

6. Plaintiff BKC specifically argues that the privilege issue "only comes into play if the Defendant is a stranger to the business rela-

tionship." Motion for Reconsideration, p. 6 n. 1.

asserts that the *Ford* decision requires the dismissal of Defendants' tortious interference claim under Florida law and that the Court, therefore, should grant its Motion for Reconsideration since the Court must clarify an error in law and/or consider an intervening change in the law.

In response, the Defendants argue that the Plaintiff misstates the holding in *Ford* by asserting that a franchisor can never be held liable for tortious interference of contractual relations and that the issue of privilege only arises when it is determined that a franchisor is not a party to the business relationship. *Id.* Contrary to the Plaintiff's position, the Defendants argue that the *Ford* case does not constitute an intervening change in controlling law. Instead, Defendants assert that *Ford* "is yet another case to be placed in the body of law which stands for the proposition that absent proof by the moving party that the interfering party acted with improper motives, a claim for tortious interference does not lie." Response, p. 2. In particular, Defendants assert that the holding in *KMS* explained that the Florida state cases fall into two (2) categories. Motion for Reconsideration, p. 4. The first category includes cases such as *Hall* and *Genet Co. v. Annheuser–Busch, Inc.*, 498 So.2d 683 (Fla.App.1986), which hold that where there are no allegations of "malice," the franchisor, "as a matter of law," may interfere with the proposed transfer. *Id.* On the other hand, the second category encompasses cases such as *Making Ends*

*Meet, Inc. v. Cusick*, 719 So.2d 926 (Fla. App.1998) and *Morsani v. Major League Baseball*, 663 So.2d 653 (Fla.App.1995), in which the court held a claim for tortious interference is actionable because the franchisor allegedly acted with "malice" in interfering with the proposed transfer. *Id.* Pursuant to these two categories, Defendants argue that *Ford* and *KMS* may be reconciled. *Ford* falls within the first category while *KMS* falls within the second. Defendants request the Court, accordingly, to deny Plaintiff's Motion for Reconsideration since no new law exists that would change the Court's prior decision denying Plaintiff's Motion to Dismiss.[7]

Upon a careful review of the parties' arguments noted above, the relevant case law, and the pleadings, the Court concludes that the *Ford* decision does not change the outcome of the Court's prior order denying Plaintiff's Motion to Dismiss Count III of Defendants' Counterclaim. This Court, instead, finds, unlike the positions presented by the parties above, that the *Ford* decision simply clarifies when qualified privilege may apply where one party asserts that a franchisor or other similar party has egregiously withheld consent pursuant to a contract right. In *Ford*, the Eleventh Circuit held that a manufacturer was not a disinterested third-party where a transfer and relocation agreement expressly conditioned a proposed transfer/relocation on the manufacturer's approval. *See Ford*, 260 F.3d at

---

7. In its Reply, Plaintiff BKC reasserts the arguments discussed above and also includes a copy of a recent District Court case in the Southern District of Florida, *Burger King Corporation v. H & H Restaurants, LLC*, No. 99–2855–Jordan (S.D.Fla. Nov. 30, 2001). In this case, the Court grants summary judgment in favor of Burger King because Burger King has a non-malicious business reason for its refusal of H & H's sale. No. 99–2855 at 11–12. However, the Court notes that the Court

cites to this Court's order denying Plaintiff's Motion to Dismiss Defendant's Counterclaim as an example of where there has been an initial showing, on the face of the pleading, that sole basis for withholding consent was for a malicious purpose. *Id.* at 12. The Court further notes, as mentioned by the Plaintiff, that BKC's prior Motion to Dismiss in *Burger King v. H & H* was denied without prejudice to allow submission of further argument in a Motion for Summary Judgment.

1294. The Eleventh Circuit explained that "[u]nder Florida law, a claim for tortious interference with contractual relations cannot lie where the alleged interference is directed at a business relationship to which the defendant is a party." *Id.* As a result a party is not a disinterested third party where it has a contractual right to approve or disapprove a proposed transfer, sale, or other transaction. *Id.* (discussing *Genet,* 498 So.2d at 684 (holding that a company cannot be liable for tortious interference as a matter of law where a wholesaler agreement was expressly conditioned upon the company's approval)). Accordingly, the Eleventh Circuit affirmed the District Court's grant of summary judgment in favor of the manufacturer where the manufacturer was sued for tortious interference on the basis of its disapproval of the relocation and transfer of their dealership.

 In a footnote, however, the Eleventh Circuit also addressed the argument that a party's privilege to interfere, pursuant to *Genet,* is qualified and does not apply where a party purposefully interferes or acts egregiously against another party. *Ford,* 260 F.3d at 1294 n. 9. The Court concluded that privilege is qualified "only where malice is the *sole* basis for the interference … In other words, the party must be interfering *solely* out of spite, to do harm, or for some other bad motive." *Id.* (citations omitted). Hence, the Eleventh Circuit clearly states that a qualified privilege exists where the *sole* reason for interference in a contract is to do harm or for some other bad motive.[8]

 The *Ford* case, accordingly, does not abrogate *KMS,* but appears to support and clarify the holding in *KMS* that "a party whose consent is required must not act within an improper purpose." *KMS,* No. 98–5336 (11th Cir. Feb. 2, 2000) at 12. Instead, in *Ford,* the Eleventh Circuit simply goes one step further stating that qualified privilege applies only where a party acts "*solely* out of spite, to do harm, or for some other bad motive." *Ford,* 260 F.3d at 1294 n. 9. Accordingly, the court's prior decision is not inconsistent with *Ford* as the Defendants' clearly alleged the elements for tortious interference with contractual relations by stating that "BKC arbitrarily, unilaterally, wrongfully, maliciously, and intentionally, interfered with the contract" between the Defendants and RII. Countercl. at ¶ 31. Clearly, the Defendants adequately plead that the Plaintiff acted solely with malice and spite when it interfered with Defendants' contract by "using pretextual and demonstrably false grounds to justify refusal to consent to the sale." *Id.* As previously held, this is sufficient to survive a Motion to Dismiss. The Plaintiff may, however, raise such arguments on an appropriate Motion for Summary Judgment.

Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiff's Motion for Reconsideration [D.E. 44] is DENIED.

---

8. The Court notes that the Eleventh Circuit cites to several relevant Florida state cases including. *Nizzo v. Amoco Oil Company,* 333 So.2d 491 (Fla.App.1976) and *McCurdy v. Collis,* 508 So.2d 380 (Fla.App.1987). Specifically, in *Nizzo,* the Court reversed a dismissal of a Counterclaim alleging a claim for tortious interference with business where Counterclaim alleged that refusal to consent to prospective purchase was based solely on person's race, an illegal motive. Further, in *McCurdy,* the Court held that summary judgment was precluded on claim for tortious interference where an issue of fact existed regarding whether malice was the sole reason for interference in the case.